This is a possessory action in which Fortune Encalade, alleging that he has been disturbed in his possession of a certain porion of land in the Parish of Plaquemines, by Leonard Cheramie, sought and obtained a temporary restraining order and, following a trial in the District Court for the Parish of Plaquemines, a permanent injunction directing Cheramie to refrain from further disturbance of plaintiff's possession.
The defendant Cheramie has appealed to this Court.
Fortune Encalade alleged in his petition that he was the owner of the following described property: "A tract of land in the Parish of Plaquemines, State of Louisiana, situated on the right bank of the Mississippi River, measuring 292' front on the Mississippi River by a depth of 40 arpents, being bounded above by land belonging to J. Rusich and below by land formerly belonging to N. Protich and now by Leonard Casbon".
Encalade further alleged that Leonard Cheramic on or about March 1, 1945, caused a quantity of lumber and other building material to be brought on plaintiff's property and announced his intention of erecting a large building thereon, and that on March 19, 1945, although Cheramic had been warned against the construction of the building on plaintiff's property, he began the erection of same.
Cheramie denied that Encalade was in possession of the property on which he had begun to construct the building mentioned in plaintiff's petition, as owner or otherwise, and averred that he, Cheramie, had acquired the property in dispute by purchase from Leonard Casbon on January 23, 1945, and, in the alternative, averred that if Encalade had, at any time, the possession of the property, he had abandoned it sometime after July, 1944, when John DeArmas, Jr., an engineer and surveyor, made a survey of property in the vicinity of the Encalade tract, showing the boundary line of plaintiff's property to be just short of the locality on which the defendant was erecting his building. The alleged abandonment is said to have consisted in the removal of a foot bridge and certain orange trees and the digging of a ditch along the line as indicated by the DeArmas survey and excluding the property in controversy. Defendant alleges *Page 831 
that as a result of the action of the plaintiff in enjoining the erection of the building he has suffered a loss amounting to $905, for which he asks judgment.
Article 49 of the Code of Practice reads as follows:
"In order that the possessor of a real estate, or one who claims a right to which such estate may be subjected, may be entitled to bring a possessory action, it is required:
"1. That he should have had the real and actual possession of the property at the instant when the disturbance occurred; a mere civil or legal possession is not sufficient;
"2. That he should have had that possession quietly and without interruption, by virtue of one of the titles prescribed in the forty-seventh article, for more than a year previous to his being disturbed; provided the possession of less than one year be sufficient, in case the possessor should have been evicted by force or by fraud;
"3. That he should have suffered a real disturbance either in fact or in law;
"4. That he should have brought his suit, at the latest, within the year in which the disturbance took place.
"When the possession of the plaintiff is accompanied with all those circumstances, it matters not whether he possesses in good or in bad faith, or even as a usurper, he shall nevertheless be entitled to his possessory action."
Article 53 of the Code of Practice declares that the plaintiff in a possessory action need only prove that he is in possession of the property as owner and that he has been disturbed in his possession within the year previous to his suit and that "when the possession of the plaintiff, or the act of disturbing him is denied, no testimony shall be admitted, except as to the fact of the possession, or as to the act of disturbance, and all testimony relative to property shall be rejected."
[1] It thus appears that the question of title is not raised by a possessory action and that one in bad faith and without title may have his possession secured to him against "extrajudicial invasion and eviction, and that the parties should be remitted to legal process for the vindication of their rights." Williams v. Harmanson, 41 La. Ann. 702, 6 So. 604, 605.
The trial of the case took a wide range and there is in the record much discussion of the title of the contending litigants. We are not interested in titular ownership of the property except insofar as it may shed some light on the question of possession.
Encalade entered into an agreement to purchase some property in the Parish of Plaquemines in 1919 and due to some complication with respect to the title, he did not acquire it until 1931, when it was sold for taxes, though he testified that he was in possession and had paid the consideration for the property to the Succession of Alfred Pelas in 1919. The tax title described the property as consisting of one and one-quarter arpents front on the Mississippi River by forty arpents in depth, bounded on one side by the lands of J. Rusich and on the other by lands of N. Protich. As a matter of fact since an arpent is 192 feet, one and one-quarter arpents would be 240 feet and not 292 feet as plaintiff claims to possess.
Defendant's counsel, measuring this one and one-quarter arpents from the lower or Rusich boundary, contends that Encalade's tax title falls some 52 feet short of reaching the Protich line and that within this 52 feet lies the property in controversy here. No reason is given for starting to measure the 240 feet from the Rusich line instead of the Protich line, for there is nothing in the title which indicates anything other than the side lines or boundaries which encompass much more than 240 feet or one and one-quarter arpents, which the tax title declares to be the distance between the boundary lines. Plaintiff's answer to this is that the metes and bounds control and, therefore, he acquired all of the land between the property of Rusich and Protich, as admittedly would be the case if he had a conventional title. On the other hand, defendant's counsel insists that there is a distinction to be made between a tax title and a conventional title in that only the actual measurements of the property, when given, control regardless of the boundaries. If defendant's counsel is correct in this, and we express no opinion, it would be difficult to determine just what property Encalade owns since there is no mention in the tax title concerning where the one and one-quarter arpents begins and where it ends.
Be that as it may, we repeat that we are not concerned with the question of title since we are considering only the question of possession. When Encalade acquired *Page 832 
the property, his land fronted on the Mississippi River and pretermitting the question of its width (whether one and one-quarter arpents or more), it had a depth of forty arpents. At the time Encalade came into possession there was no highway as there is now (U.S. Highway No. 31), traversing that section of Plaque-mines Parish. Encalade fenced the front property, which was the high land and that fence extended along his entire frontage. There was no fence along the side lines back of where the highway now exists because that section of the land, prior to the installation of drainage, was marshy and subject to occasional inundation.
Cheramic only claims the possession of the land back of the highway and argues that the fact that Encalade's fence enclosed the land on the other side of the highway fronting the Mississippi River, and directly in from of the back land which he claims to own is immaterial because the principal that the possession of a part of a piece of property is the possession of the whole, as described by the title, does not apply here since Encalade never had title to the land now claimed by Cheramie. However, Encalade does not claim constructive but actual possession.
The sole question now before us is who had possession of the disputed land. That question, one of fact, was decided by the trial court adversely to the contention of the defendant Cheramie. The Court in its opinion declared that "the testimony and evidence show to the satisfaction of this Court that Fortune Encalade, plaintiff herein, has been in possession of said property for a great many years, and that he has the real and actual possession of the property at the instant when the disturbance occurred, as required by C. P. Art. No. 49, and accordingly, as provided by C. P. Art. 53."
Encalade testified that he used the property in controversy as a ball park when it was dry and that he also planted vegetables and orange trees thereon; that until the drainage pumps were installed four or five years before the bringing of this suit, the land, most of the time, was under water and not usable, however, he claims since the installation of the drainage pumps, he has cultivated the land on which Cheramic started constructing his building.
Tony Rodi, Encalade's stepson, testified that Encalade had cultivated and planted the land and that he had worked on it himself and that the place where Cheramie was attempting to build his house had been used as a ball park, when dry, for about fifteen or twenty years.
August Demolle, a resident of the vicinity, who worked for Encalade, testified that he did some plowing on the land and that corn, cucumbers and beets had been planted there on the site of the Cheramie building, and that the last time it was plowed was in October, 1944, (the case was tried in May, 1945).
Johnny Rusich testified that Encalade had cultivated the property and that he had played ball in the ball park and that before the drainage pumps were installed they could only play at low tide because at high tide it was wet.
Frank Pelas, who lives in the vicinity "about three acres away from Encalade's place" said the Encalade had been in possession of the property for about fifteen years.
Leonard Casbon, Cheramie's author in title, when asked whether the testimony concerning Encalade's occupation of the property behind the Cheramie building was correct, at first replied in the affirmative and later denied any knowledge of it. He subsequently admitted that there had been a ball park there at a time when "everybody used it" and finally he conceded that Encalade had had the property plowed in October, 1944.
[2] Our conclusion is that the plaintiff, Encalade, had possession of the land in controversy, but defendant's counsel strenuously contends that if that is true the possession was abandoned by Encalade. A number of photographs have been introduced for the purpose of showing that the property had not been cultivated as claimed by Encalade. However, we note in the testimony of Casbon, that the weeds grow very quickly and profusely on the property in that section, and it may well be that the brush discernible in the photographs may have developed after the last plowing, which was some six months before the trial of the case.
On the question of abandonment, the argument is that Encalade built a new bridge and dug a new ditch along the line of the DeArmas survey which is pointed to as indicating an intention on his part to conform to the limits of the DeArmas survey, which shows his side line nearest the Protich land to be well short of the property *Page 833 
in question. To begin with the DeArmas survey was taken for the assessment rolls of Plaquemines Parish which, no doubt, do show exactly what appears on the De Armas survey, but neither De Armas nor the assessor could finally determine the legal question of where plaintiff's property begins or where it ends. Moreover, Encalade testified that the new bridge was erected as a matter of convenience in delivering merchandise to his store. It affirmatively appears that he had no intention to abandon any claim he had to the property for, as the learned trial judge stated in his reasons for judgment, his conduct strongly suggested the contrary. We quote from his reasons: "The defendant contends that plaintiff abandoned possession of this property by the fact that he has removed a bridge which used to be on the lower end of his property to further up towards the middle of said property and that he also dug a ditch on a line which has been shown to have been made by John C. DeArmas, Surveyor, in the month of June, 1944. There is nothing in the record to justify the belief that plaintiff Encalade ever abandoned possession of his property. The fact is, as shown by the evidence, that the moment defendant started to bring material on the lower line of his property to erect a building thereon plaintiff's stepson, who was on the premises at the time, immediately notified defendant Cheramie that he had no right to build there as the property belonged to his father, who was in possession of same, and the testimony of plaintiff Encalade further shows that he also notified the defendant, Cheramie, not to trespass on his property and that when Cheramie persisted in doing so, he (Encalade) employed an attorney, who wrote to Cheramie, as shown by the letter which was produced and admitted to have been received by the defendant; that besides, when defendant Cheramie persisted in building on plaintiff's property, plaintiff tried to forcibly prevent him from so doing and the consequence was that, at the insistence of Cheramie, plaintiff Encalade was arrested and charged with disturbing the peace, and Cheramie himself testified that he followed plaintiff after he was arrested to the Courthouse at Pointe-a-la-Hache, where plaintiff was brought to be incarcerated in jail, and Cheramie further testified that the reason he did so was that he wanted plaintiff Encalade to agree that he (Cheramie) should continue building on said premises, all of which proves most conclusively to the Court's satisfaction that plaintiff Encalade never abandoned possession of the property, and it is the opinion of the Court that Fortune Encalade, plaintiff, was in full possession of said property prior to the disturbance, as shown on the trial of this case, and considering the only question involved in this suit is that of possession, the Court finds that plaintiff, Fortune Encalade, is entitled to a judgment perpetuating the Writ of Injunction herein issued. The judgment, however, does not decide any question in reference to title, which can be litigated by appropriate proceedings, either by Petitory Action or Action in Boundary, as provided by law, more particularly C. P. Art. 55."
Our conclusion is that the judgment of the trial court was correct, consequently, and
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.